By the Court—Woodruff, J.
The complaint in this action states, as the ground of the defendants’ liability, that on or about the 22d of February, 1854, the defendants employed Graseman & Co. to procure a charter for the ship Typhoon, (of which they were, or claimed to be the owners,) for a voyage from London to some foreign port and back to London, and agreed to pay them a commission of five per cent upon the freight, to be paid by the charterers, and also to consign the vessel to Graseman & Co. on her return to London from the voyage to be performed under the charter party, and that they, Graseman & Co., should be entitled to collect the freight and do all the business of the ship upon such return voyage which it is usual and customary for consignees to do; for which services, as consignees, they should be entitled to charge the defendants, and to have and receive from them, the usual and customary commissions and compensation for such services.
That Graseman & co. procured for them a charter, (Broadwood & Barclay becoming charterers,) whereby the gross freight or charter-money of £12,000 sterling was secured to the defendants, and the ship entered upon and completed the stipulated voyage, and earned the freight named in the charter.
But the defendants did not, upon the return of the ship, consign her to Graseman & Co., or permit them, (although ready and willing, &c.,) to do the business thereof and earn the commissions therefor, but consigned the ship to other persons, who did the business and earned and received a large amount of commissions therefor, which, of right, belonged to Graseman & Co., and the defendants did not pay nor allow Graseman & Oo. any commission or compensation beyond the aforesaid commission of five per cent upon the amount of the said charter.
That, by reason of the non-performance of the said con *424 tract by the defendants, Graseman & Co. were deprived of the commissions, gains ánd profits which they could and would have earned as consignees of the said vessel; which commissions, so lost by them as aforesaid, according to the usual and customary rate, were and would have been two and one-half per cent upon the amount of freight, which would have amounted to fourteen hundred and seventy dollars; and the defendants then and there became liable to pay Graseman & Co. that sum.
An assignment to the plaintiff by Graseman of the latter’s interest, is then stated.
The answer first denies all the allegations in the complaint, and then, in effect, denies any agreement, by the defendants, to pay Graseman & Co. any further or other compensation than the five per cent. It avers that that per centage was to be in full for all services to be performed by Graseman & Co. in or about the ship and her cargo during the entire voyage, including the services for which compensation is sought in this suit.
That by an agreement then existing between Graseman & Co. and Broadwood & Barclay, the charterers, it was the duty of the former to perform for the latter, the services for which compensation is sought in this action, and the defendants, by reason thereof, did not become liable therefor to Graseman & Co.
And, finally, that the services which Graseman & Co. were entitled to perform in the premises, as alleged by the plaintiff, consisted of collecting the freights due on the homeward cargo of the ship, which freights were due and payable by the owners of the cargo to the charterers, Broadwood & Barclay, and were not due to the defendants. And, therefore, if Graseman & Co. were entitled to perform the service and to receive a commission as compensation therefor, their agreement in that behalf, if any, was with and their claim is properly against the said charterers, and not with or against the defendants.
Upon this review of the pleadings, it is proper to say that the making of an agreement by the defendants with *425 Graseman & Go. that the vessel in question should be consigned to them on her return to Europe was distinctly proved, and by evidence which was not controverted. It was no less distinctly proved that on such return she was not so consigned, but that the defendants or their agent refused to consign her to Graseman & Co. This alone is a sufficient reason why the motion for a nonsuit or dismissal of the complaint was properly denied; for upon these facts the plaintiff was at least entitled to nominal damages. The real controversy, therefore, between the parties must be regarded as relating only to the question how much the plaintiff, under the above pleadings and the proof given on the trial, was entitled to recover.
The complaint in very clear terms rests the right of recovery upon the agreement of the defendants to consign the ship to Graseman & Co., and that Graseman & Co. should be entitled to collect the freight, and to do the business of the ship upon such return voyage which it was usual for consignees to do, and should charge the defendants, and have and receive from them, the usual and customary commission or compensation for such services. The subsequent allegations of readiness to perform, and of the defendants’ refusal to permit them to do the business, and the consequent liability of the defendants to pay them the usual and customary commission, refer to the agreement so alleged, and such liability is the result of such agreement.
The complaint is therefore a claim to recover moneys which the defendants agreed Graseman & Co. should be entitled to charge to the defendants, and should have and receive from the defendants by way of commissions or compensation for services as consignees.
It does not proceed upon the idea, nor in any wise state or aver that Graseman & Co. were to be entitled to collect freight which was not due to or coming to the defendants, and thereby earn commissions which the charterers would be bound to pay or allow to them, and that by reason of the defendants’ breach of the agreement they lost the opportunity to earn such commissions and receive them *426 from the charterers, Broadwood & Barclay, to whom the freight of the cargo on the inward voyage belonged. And yet the Jury were instructed that although they should find that the five per cent which the defendants have already paid, is compensation for collecting for the defendants the unpaid charter money, still, by the breach of the defendants’ contract to consign the ship to Graseman & Co., the latter lost the opportunity of earning commissions for the collecting the freight of the return cargo, and are entitled to recover what they might have so earned. This part of the charge is subject to some further observations, which will be hereafter suggested, but the present reference to it is for the purpose of remarking that if the five per cent was Graseman & Co.’s full compensation for collecting the charter money, there is no evidence whatever in the case that the defendants were, either by usage or by agreement, bound to pay Graseman & Co. commissions for collecting the freight of the inward cargo, which, by whomsoever collected, belonged solely to the charterers. And as the complaint seeks only to recover commissions properly chargeable to the defendants, which the complaint avers they agreed Graseman & Co. should have, and which they lost by a breach of the agreement, it is by no means clear that it was not erroneous to charge that under such a complaint the plaintiff could recover as damages for a breach of the agreement to consign, the loss of the opportunity to earn commissions from other persons; on freight belonging to the latter, which damage was not alleged in the complaint at all. In this view of the subject it is also to be observed that there is in the case much ground for believing that the only recovery which has been had herein is upon the ground that by reason of the failure of the defendants to consign to Graseman & Co., the latter lost the commissions on the freight of the return cargo, and that the Jury rejected entirely the claim that Graseman & Co. were, by the agreement, to be entitled to charge the defendants anything, or to have or receive from them any commissions or compensation for *427 any services whatever, other than the five per cent which was paid to them. And the plaintiffs’ Counsel, in his statement prefixed to his points, states that the Jury did find for the plaintiffs their commissions, at the rate of 2£ per cent on the inward freight.
This could only be as damages for not permitting Graseman & Co., to earn and receive the commissions from the charterers, and not as an amount chargeable to the defendants, which Graseman & Co. were, by agreement, entitled to have and receive from them, for, as already suggested, there is no evidence either of usage or agreement which would make the defendants, after having received their charter money and paid all commissions for collecting it, also liable for commission on the freight of the inward cargo.
If the omission to describe and claim for such a cause of action as this instruction to the Jury recognizes, can be regarded as creating only a discrepancy amounting to an immaterial variance, this would not be fatal. The answer itself avers that the services referred to in the complaint which Graseman & Co. were entitled to perform, and for which compensation is sought to be recovered in this action, consisted of collecting the freights of the homeward cargo.
Obviously, then, the defendants have not given to the complaint the construction above stated; they seem to have understood the plaintiff to be claiming to recover commissions on the freight of such homeward cargo, and, if so, whether the claim was as damages for the loss of appellants to earn them from others, or as damages for the neglect of the defendants to permit Graseman & Co. to earn and charge the amount to the defendants, there would probably be no such variance as would prevent a recovery.
The case was evidently tried upon the theory, (to some extent resisted by the defendants,) that under the complaint the plaintiff might recover, if the proof should warrant it, upon either of two grounds.
First, if the Jury were satisfied of one state of facts, the *428 plaintiff would be entitled to recover commissions upon the whole or some part of the charter money as commissions payable to Graseman & Co., by the very terms of the defendants’ agreement or as implied in or resulting from the agreement to consign the ship to them.
And, second, if the Jury were satisfied of another state of facts, then the plaintiff was entitled to recover as dama- ' ges for a breach of the agreement, to consign to Graseman & Co. the amount of the commissions which they would have earned and been entitled to receive from the charterers, for collecting- the freight of the inward cargo of the vessel.
The former ground conforms to the statement of the cause of action set forth in the complaint. The latter, if it does not depart from the complaint in its entire scope and meaning, is a large departure therefrom.
It is material to state these two grounds of claim and subjects of recovery as damages for a breach of the defendants’ agreement, and to keep them in mind in considering the exceptions, arising upon the admission and rejection of evidence, to be presently considered.
And it may be useful, also, to state, in general terms, the purport of some of the testimony.
The complaint having alleged an agreement to consign the ship to Graseman & Co., and that they should be entitled to charge the defendants, and receive from them in addition to the five per cent for procuring the charter, the usual and customary commissions, those allegations might (upon a liberal view of what alone, under our present system, constitutes a variance,) be proved, by evidence of an agreement to consign and pay a specified commission, which was, in fact, the usual commission; by evidence of an agreement to consign, and in terms to pay the usual commission, and proof of what rate was usual; or by evidence of an agreement to consign, and proof that according to the usage and custom of the trade, the consignee of the ship, as an incident to the consignment, received commissions therefor at a customary rate.
*429 And under the other aspect of the complaint, viz.: that it claimed damages for the refusal to consign to G-raseman & Co., to the amount of the commissions which they might have earned by collecting the freight of the inward cargo, if the complaint might be so treated, proof that the consignee of the vessel, as an incident to the consignment according to the usage and course of the trade, collects such freight and receives such commission from the person who owns the freight, was material.
Accordingly the testimony on the part of the plaintiff and defendants, exhibits remarkable variety of views regarding the usages and custom of trade, and contradiction regarding the actual agreement.
The charter party between the defendants, as owners, and Broadwood and Barclay the charterers, which was negotiated and obtained for the defendants by Graseman & Co., secured to the defendants the round sum of twelve thousand pounds (£12,000) sterling for the whole voyage, and gave to the defendants “an absolute lien on the cargo” as security for such charter money.
When the ship reached London on her return voyage, there remained unpaid and due to the owners from the charterers, six thousand five hundred pounds (£6,500) sterling of the said charter money.
The vessel on her return voyage brought an inward cargo to London, the freight of "which, according to the bills of lading, was nine thousand six hundred pounds (£9,600) sterling, and the defendants had a lien upon such return cargo for the aforesaid balance unpaid of the charter money due to them from the charterers.
The defendants agreed to pay, and did pay to Graseman & Co., five per cent on the gross amount of the charter money, and deny that they are liable for any other or further commissions, and it was not denied on the trial, that they did not consign the vessel to Graseman & Co. on her return voyage.
The charter party between the defendants (by their agent) and the charterers, and to which they only are *430 described as contracting parties, and which was only executed by the said agent and charterers, contains two paragraphs in these words :
“In consideration of this charter, a commission of five per cent on the gross amount of freight is now due by the owners (ship lost or not lost,) to Graseman & Co. of Ho. 2 Royal Exchange Buildings, London, for which the owners hereby give them a lien on the freight, and with them the original charter party is to be deposited.
“Likewise in consideration of this charter, the owners agree with Graseman & Co., that the vessel upon her return to Europe, is to be consigned to and reported inwards at the Custom House by them or by their agents at the out-ports, or on the continent.”
Graseman testified, that there was an express agreement between his firm and the defendants’ agent when the firm were employed to procure a charter for the vessel, by which Graseman & Co. were to receive for their services in procuring and effecting such charter, a commission of five per cent on the gross amount of chartered freight, and as a further consideration for their service, it was also agreed that the vessel on her return should be consigned to them and be reported by them to the Custom House, and they were to be entitled to charge and receive •therefor “their usual consignment commission of two pounds ten shillings per centum on the gross amount of her chartered freight.”
Obviously, if this agreement was established on the trial by competent evidence, the right of the plaintiff to recover the whole sum claimed in the complaint is clear. But the defendants’ agent unqualifiedly denied making or assenting to any such agreement, and says that he declined permitting them to procure a charter if they were going to charge a return commission of two and a half per cent as they had done on two previous voyages. That although the defendants, not having then understood the custom of the port, had agreed to it in the two *431 previous charter parties, they should not do so agaiu, and should decline doing any more business with that charge.
Whether there was or was not any express agreement that the defendants should pay to Graseman & Go. any further or other commission than the five per cent, was the subject of distinct contradiction, and was left in doubt by this evidence.
Eesort was therefore had to evidence of the usage and custom of the trade, which, in the double aspect of the plaintiff’s claim above stated, might be useful for either of several purposes, viz.: to show that such consignment commission of two and one-half per cent on the gross chartered freight, was the customary charge, and usually paid, and create a probability that Graseman’s testimony was truthful and most entitled to belief—or to show that as an incident to the consignment to them, they would be entitled to charge such a commission to the defendants, without any terms of express stipulation, fixing their compensation as consignees of the ship inward—or to show that as an incident to the consignment, they would be entitled to collect the freight on the inward cargo, and so earn a commission and receive it from the charterers.
Accordingly proof was given relating to the usage and custom of trade at London.
Graseman testified that the usual commission charged and received by ship-brokers and merchants for collecting freights and doing the business of a ship arriving with cargo, was two and one-half per cent on the inward freight.
That his firm, when they procured charters, charged and received, (in two previous instances from the defendants, and in the case of between one and two hundred other instances in which, since 1849, they had procured charters for American vessels from the owners thereof,) five per cent for procuring the charters, and two and one-half per cent on the gross chartered freight as a consignment commission for doing the business of the ship. He does not say, however, that this charge is usual or customary with others.
*432 Another witness states the general custom was to charge, for collecting freights and doing the business of a ship arriving with cargo, two and a half per cent “ on the gross amount of the freight earned by the ship.”
Another witness states the usual consignment commission to be two and half per cent “on the gross amount of the freight;” that he has had to pay five per cent for procuring the charter, and two and a half per cent on return for collecting the freight; and he mentions 235 instances within his knowledge, in 204 of which two and a half per cent consignment commission on the return of the ship to London was paid upon the gross freight secured by the charter, in 21 of which a less or no commission was paid, and in 10 of which a higher rate was specified, and that, in those 204 instances, the amount of the consignment commission was not mentioned in the charter party.
Other evidence tended to show that the usual commission paid by owners for effecting charters was in all seven and one-half per cent on the gross freight secured to the owners by the charter, though some of the witnesses think the two and one-half per cent consignment commission was, in all cases under their observation, expressly stipulated, or it would not be, according to the custom, payable.
On the other hand, evidence on the part of the defendants tended to show, that although consignees of a vessel, collecting the freight of the cargo which she brings, are entitled to a commission therefor, when they have had no concern in procuring the ship’s charter, and that such commission is payable by the party to whom the freight belongs, yet that this custom has no application to the relation of the owners of the ship to brokers who procure a charter, and receive a commission therefor.
Some witnesses testify that, in such last case, the broker, by the custom and usage, receives five per cent, and the vessel is consigned to him on the return, and he receives two or three guineas for reporting and entering the ship*, and the owner pays him nothing more.
Some who testify to the same effect, add that this five *433 per cent does not cover the commission for collecting the freight on the inward cargo or bills of lading, but that that is the business of the charterer, and not paid by the owner of. the ship. While some testify that where the broker is paid five per cent for procuring the charter, that covers the collection of the freight upon the inward bills of lading.
Others, that it covers all commissions payable by the owner, including the collection of the chartered freight, if the vessel returns to London—and to that extent the collection of the freight upon the inward bills of lading—i. e., so far as such collection is for the benefit of the owner, but it does not cover the collection of such freight on the bills of lading for the benefit of the charterer.
One witness states that when it is stipulated that the ship shall be consigned to the broker on her return, the five per cent covers all his charge. But when the owner voluntarily, without any such agreement, corisigns his ship, on her return, to the same broker, the latter is allowed and charges the same commission as in cases where he did not procure the charter.
Some witnesses consider that the broker is not bound to take the consignment inward free of charge, but when he does take such consignment it is not usual to charge the owner any commission or compensation, except the fee of from two to five guineas for reporting and entering the ship.
And in stating the amount or rate of commission on consignment of vessels, and the collection of her freight, the witnesses differ as to such rate. Most of them name two and one-half per cent as usual where the broker has not received a commission for procuring a charter, or when he collects for the benefit of the charterer; and some state one and some one and a half per cent, and some make it dependent on agreement.
But the witnesses for the defendants are numerous, and the testimony overwhelming that there is no general, uniform, established usage or custom in London, under *434 which a broker who has procured a charter and been paid five per cent on the chartered freight or gross charter money, is entitled to charge the owners another or further commission, where, by stipulation in the charter party, the ship is consigned to him on her return to London.
The case, then, on the trial, presented this condition of the proofs.
Whether there was an express agreement by the defendants to. pay Graseman & Co. two and a half per cent commission on the charter money, (£12,000,) was a question involved in great doubt by the conflict of testimony.
That there was, in the absence of any such agreement, no uniform, established, general usage or custom in London for brokers, procuring charters, and who are paid five per cent therefor, to charge or receive from the owners such a consignment commission, although the ship was consigned to them, was most convincingly proved by the defendants, and very slight proof, if any, to the contrary was given ; though instances of such payment to Graseman & Co., and one or more other houses, was testified to.
But there was evidence tending to show that had the defendants consigned the ship to Graseman & Co., they would, according to the usual course of business, have collected the freight on the inward bills of lading, and been entitled to receive from the charterers a commission, either on the whole amount, or on the excess over and above the £6,500 unpaid charter money then due to the defendants, and for which the defendants had a lien on the cargo.
This review of the trial and the condition of the case upon the pleadings and all the proofs which were given, will render the discussion of the exceptions more easy, and I trust intelligible.
The first question is one which involves the admissibility of a large portion of the plaintiff’s evidence, and is raised by numerous objections taken to testimony by the defendants and by requests to charge. The charter party containing the paragraphs which are above extracted therefrom, any evidence of a parol agreement to pay Graseman *435 & Co. any commissions other than the five per cent, was objected to on the ground that the charter party must be taken to be the written memorandum of what was agreed on that subject. For the like reason, all evidence of a custom or usage to pay the broker any other commission than the five per cent was objected to.
We are not satisfied that the charter party is to be regarded as in any sense, the agreement between the defendants and their brokers, or even as presumptively defining all the duties which the brokers should perform, or all the compensation which they should receive. It was an agreement in form and in fact between the defend7 ants’ agent and the charterers, and its object was to define their rights as between each other. There was propriety in introducing into their agreement a recognition of the agreement to give Graseman & Co. a lien on the freight for their five per cent commission, and of the agreement to consign the vessel to them on her return. The defendr ants had a lien on the cargo for the charter money. The charterers themselves had an interest in the question to whom the ship should be consigned, and through whose hands their inward freight should pass. The stipulation might be to their advantage, or it might operate to bind them by showing their concurrence in the arrangement.
Besides, the charter party was entirely silent on the subject of the consignees’ compensation for receiving the consignment of the vessel and doing her necessary business and collecting her freights, and if, according to the uniform custom and usage of trade, the collection of the inward freights and the allowance of a commission therefor -was an invariable incident to. the consignment to Graseman & Co., then stipulating that such consignment be made to them, carried with it the incidental right to earn and receive from some one (either the owners or charterers) those commissions.
The most we think that can be claimed on this point is, that the omission to insert anything in the charter party respecting Graseman & Co.’s compensation for the con *436 signment, (viewing these paragraphs in the charter party as-recitals) is some evidence to be commented upon and submitted to the Jury, that the owners, at least, were not to pay them any additional sum besides the five per cent which was mentioned. We think it was not conclusive, and did not preclude proof either of the actual agreement or that a right to earn further commissions was, by the usage and course of trade, an incident to the consignment which was agreed to be made to them.
This disposes of a very large number of the exceptions taken by the defendants, which arose upon the same or a similar objection to parts of the plaintiff’s evidence throughout the case.
So in relation to the objection to proof that on two other occasions the defendants had paid Graseman & Co. the two and a half per cent consignment commission, which they claimed on the whole amount of the charter money.
Until the defendants’ explanation of those payments appeared, they were some evidence, either that the defendants knew when they employed them, that that was their usual charge and had assented to its propriety, or that they knew that the charge was in conformity with the usage and custom of the trade, and, therefore, proper. And this is especially true, Avhere in one of those instances the terms of, the charter party were like that noAV in question, and was silent in respect to the subject of consignment commission. •
The objection to what the master of the vessel, (Samuel •Goodhue,) told the witness Wilkins, had it been confined to what Goodhue said was contained in the telegraphic message from one of the defendants,- (Salter,) would we think, have been well taken. It was mere hearsay. But ■the objection was general to all that passed on that occasion, and a portion of it showed that the plaintiff offered to report the ship, and declared his readiness to do the ¡ship’s business, and that the master of the ship not only refused to allow that but even to wait until the arrival of *437 the defendant Salter. These latter facts were competent and bore directly upon the matters in controversy. The objection was, therefore,' too comprehensive, and was properly overruled.
The objection that Platenius, when inquired of in relation to the usage in London in 1854, was not shown competent to speak of the usage, having been a merchant’s clerk in London for one year, and that in 1848 and 1849, was probably well taken when made, but the subsequent testimony of the witness to his subsequent experience and acquaintance with the business, obviated the objection and rendered the exception unavailing.
The objection to the reading of certain parts of two charter parties, which are said in the case to be stricken out, and the exception of the defendants to the ruling, we cannot understand. The case does not show what parts of those charters were stricken out, or that anything was read which had been stricken out. Whether the objection was well founded or not, we cannot determine. That when an agreement is offered in evidence for the purpose of showing what was agreed to therein, it is not competent to read as parts of such agreement, clauses which were struck out before' the agreement was signed, is so obvious a proposition that we can hardly suppose that the contrary was ruled on this occasion. . And it is not obvious that parts of an agreement between other parties which were not assented to, and were struck out so as to form no part of the actual agreement, could be evidence for any purpose, unless possibly it might be to contradict some witness who had testified that those agreements did contain what was thus erased or stricken out. But, as the case is made up, the objection is not intelligible, and we cannot say the ruling was so erroneous as to call for a reversal on that ground.
We do not perceive how the letter of the defendant Salter, written in 1852, nearly two years before the charter in controversy was procured, was material, except so far as it spoke of the customary commission. As to that *438 part of it no objection was made by the defendant, and except as to that and so much as was necessary to explain what charters Salter referred to in saying two and one-half per cent was customary “ on such charters,” it was wholly irrelevant and should have been rejected, and yet it was so utterly foreign to the matter before the Court and Jury that we do not see that the reading of it could possibly have affected the result. It is true that whatever the letter contained was a declaration of one of the defendants, and the general agent of the others authorized to do as if the ship was his own. .We should, however, be very reluctant to say that the introduction of matter so entirely irrelevant furnishes ground for giving effect to an exception and for disturbing a verdict. And yet there must be some limit even to permitting a case to be cumbered with such matter, even though we cannot see that it could have had any influence on the Jury in determining the matter in controversy.
The supposition of Salter in relation to what obligation he was incurring at the time he was negotiating for the charter, was not competent evidence, and was properly excluded. The rights of the parties do not depend on what he supposed, but on what was said, done or agreed.
The question put by the defendants to their witness, Salter, whether after his conversation with the plaintiff, (in which he had refused to permit Graseman & Co. to procure a charter upon the terms of charging the defendants two and a half per cent consignment commission,) “ he was given to understand, directly or indirectly, by the plaintiff or Graseman, that the negotiation for the last charter party was carried on, on the supposition that they were to receive a consignment commission?” was objected to when Salter’s deposition was taken, as a leading question. We incline to the opinion that the question was leading. Put to their own witness in connection with the previous course of examination, it indicated, we think, to Salter, the answer which the examining Counsel *439 expected and desired, (See Cow. and Hill’s Notes to Phil. Ev., part 1, p. 722 ; note 502, to p. 268 of Phillips’ Text, and the authorities there collected.) The testimony, however, was in a deposition taken apparently de lene esse under the statute, and we do not understand that the statute permits the objection that a question is leading, to be raised on the trial. (2 Rev. Stat., 393, § 9.) To permit it would seem to conflict with that species of discretion which is entrusted to a Judge before whom an examination is had, to permit leading questions where he discovers that the witness testifies unwillingly, and is manifestly disposed to favor the party adverse to him who is examining him. (The People v. Mather, 4 Wend., 247.) The objection, however, which was raised at the trial, is riot stated to have been to the form of the question—it was general, and if the defendants’ Counsel did not call for the ground of objection, it may be assumed to cover any legal objection to the question; and we are of opinion that it was properly ruled out, because it sought to ascertain, not what Weber or G-raseman said to the witness, but, what impression was produced upon his mind by what passed, if anything, on the subject. What was said or done by Weber or Graseman, or whether they or either of them said anything, and if so, what, on the subject, were, if put in proper form, the competent inquiries.
The defendants’ objection to the reading of the deposition of Robert G. Barclay, was that a plaintiff is not entitled to read a deposition in evidence which was taken under a commission, issued on the part of the defendants. No other ground of objection is suggested. The statute is explicit in its terms, that such a deposition may be read in evidence on the trial, by either party. (2 Rev. Stat., 396, § 23.) The objection was properly overruled.
What has now been said, in effect, disposes of most of the exceptions to the refusal of the Judge to charge specially various propositions requested by the defendants’ Counsel, without the necessity of our discussing each.
Those requests which require the Court to instruct the *440 Jury that the plaintiff could not recover for loss of good will, seem to us irrelevant. They were properly refused, whether as abstract propositions, correct or not, for no such claim appears to have been suggested in the pleadings or on the trial. There was no occasion to advert to the subject of damages for loss of good will, for no such damages were sought.
And on the question whether if the vessel had been consigned to Graseman & Co., they could have earned a commission on the freight by collecting the same for the charterers, Broadwood & Barclay, there was evidence that might warrant the inference that when the vessel was consigned to Graseman & Co., by the consent of the charterers expressed in the charter party, .Graseman & Co. would, according to the usage and custom of trade, have been entitled to collect the freight of the inward cargo, and have their commissions upon the whole of such freight. Some of the evidence, in regard to the incidents of a consignment and the usage of trade tended to that inference. It was, therefore, not error to refuse to instruct the Jury that Graseman & Co. would not have had a right to collect the whole of the inward freight, or that Broadwood & Barclay would have had a right to collect the balance after the rent and charter money had been collected, without paying Graseman & Co. commissions thereon, or that the recovery must be limited to two and a half per cent on the amount of charter money unpaid on the return of the ship.
But there are some exceptions to the rulings on the trial which seem to us well taken.
Against the objection of the defendants, the belief of the witness Graseman, was received, that the reason why the vessel was not consigned to them on her return to London, “ was that the owner considered that by not so consigning her, they should not be obliged to pay the consignment commission to Graseman & Co.” We consume no time in an attempt to argue that Graseman’s belief was not competent evidence! If, therefore, what he stated upon his belief was matter which might have influenced the *441 Jury, the objection was not only well taken, but the error was a material one. How if any witness had testified, of his knowledge, that the defendants “ considered,” or that they had said that they considered that by not consigning the vessel to Graseman & Co. they should not be obliged to pay them a consignment commission, the proof would have tended strongly to the conclusion that the defendants “ considered ” that if they had consigned the ship to Graseman & Co., as they had agreed to do, the latter would have earned and been entitled to receive from them such commission. That they were conscious of this would have been an obvious inference, and so the proof would have tended to an implied admission that Graseman & Co. lost, by their breach of contract, a commission, which, had it been performed, Graseman & Co. would have earned and received. The matter so stated, on the witness’s belief, was, therefore, if it were established as a fact, not only ' material but important. The belief of the witness, however, was not competent evidence of such fact and should have been excluded.
We do not, upon a review of. all the evidence, think it probable that the admission of this evidence had an influence on the result, but we cannot judicially say that it had no effect, if the case were nicely balanced upon the other evidence. We cannot say that it might not operate to turn the scale against the defendants.
The statement of the witness, Platenius, that Graseman & Co. did more than half the business done in London with American ships, does not appear to us to have been competent testimony for any purpose. If it was designed to bear on the question of usage, in connection with what had been shown of their custom to charge a consignment commission in cases like the present, it is liable to the suggestion that proof of the custom of a particular house is not competent as proof of general usage; and yet the Jury may possibly have been influenced by the idea that what Graseman & Co. charged in more than half the business of American ships went far to establish general *442 usage. If it did not bear on that question, it seems irrelevant. If it did not influence the Jury as suggested, it probably did no harm; and yet the Court should be very cautious in declaring judicially that evidence not competent could do no injury, and for that reason disregard an exception, although in very clear cases that may be permitted.
In answer to one of tlie interrogatories put to Graseman, and also to Wilkin, each of them stated that if the ship had been consigned to Graseman & Co. on her return voyage, “ the sum upon Avhich Graseman & Co. would have been entitled to charge a consignment commission of two pounds ten shillings per centum, was twelve thousands pounds sterling, that being the amount of the gross chartered freight of the vessel. How whether they would have been so entitled was one of the main questions, if not the sole point, in the controversy before the Court, and it depended upon the question whether the defendants agreed to pay it, or whether, by the usage and custom of the trade, it was charged and paid as an incident to the consignment. The witnesses might properly testify, and did testify, to the facts relied upon, to prove such an agreement, and they had stated all that they knew and were desired to state respecting the usage and custom. But it was hardly competent to permit them in a word to decide the very question upon which the Jury were to pass, by saying that Graseman & Co. were entitled to charge that commission and upon the whole charter money.
We are aware that it is possible to give an unobjectionable construction to this language by interpreting words of reference to what it is usual and customary throughout the trade to charge and receive, and make the witnesses say that by said usage .Graseman & Co. would receive the commission specified. But so far as Graseman had spoken of any general custom, he had only stated that two and a half per cent on the gross amount of inward freight was usually charged by brokers and others col-" *443 lecting freights and doing the business of a ship arriving with cargo.
We think the testimony was objectionable and ought not to have been received.
The defendants, in connection with the subject of conversation between Graseman and Kingsland, one of the defendants, on the examination of the latter, put the following question, which was objected to by the plaintiff and excluded, viz.: “What was said by the plaintiff about commencing the suit in the City of New York rather than in London?”
The ground of this objection is not stated, nor did it, so far as we can discover, appear whether the conversations referred to were before or after Graseman had assigned his interest in the claim to his partner Weber. It is probable that, although the word “plaintiff” was used in the question, Graseman was the person intended thereby—and if the conversation referred to were after such assignment, then what Graseman said was not competent evidence, unless the answer would have shown some contradiction between what was said and what Graseman had testified in his deposition, or would otherwise affect his credibility. And, if the proof of the conversation was for the purpose of contradicting Graseman, then the rule requires that he should be first examined on the subject. What would have been the answer — whether it Avould have had any relevancy to the matters in issue—we cannot know. It would have been quite proper to require the Counsel to state to the Court what he designed to elicit, so far, at least, as to enable the Court to see that it would either contradict Graseman or involve some statement or admission which might legally affect the question at issue or the credibility of the Avitness. On the other hand, if by the “plaintiff” in the question Avas-intended Weber, the testimony was in its nature competent, and its relevancy could not safely be determined on the mere face of the question.
We do not discover any just ground for rejecting a por *444 tion of the testimony of the witness; Salter, (by whom the negotiation with Graseman & Co., in respect to their employment and the terms of the charter, was conducted on the part of the defendants,) in which he stated what passed between him and the plaintiff at the time. The plaintiff’s Counsel, as stated in the case objected to that portion of the witness’s answer, which relates to negotiations in respect to the amount for which the ship should be chartered. It was in that negotiation, according to the testimony of Graseman, that the payment of two and a half per cent consignment commission was agreed to. The witness, Graseman, had been asked whether there Aras any, agreement in regard to the commission or compensation which Graseman & Co. were to receive for effecting or procuring such charter, and if yea, to state fully and in detail the terms and conditions of the agreement, and further, upon what terms a charter party Avas executed. His testimony and Salter’s, in regard to any agreement to pay or allow them any consignment commission, were in direct conflict. In the answer, a part of Avhich was excluded, and in reply to a distinct question calling for the answer, (and which question does not appear to have been objected to on the trial,) Salter stated the whole negotiation relating to the charter in detail. W.e think it was competent for the defendants to have all those details, not because the terms of the charter were in dispute, but in order that the whole of the res gestee might be before the Jury just as it occurred, and that it did not embrace any such terms or conditions requiring the payment of such, commission to Graseman & Co.; for it is to be borue in mind that Salter did not negotiate with the charterers at all. The whole of the terms and conditions upon which he accepted the charter Avere settled between him and Graseman & Co., and it was proper, we think, to allow him to state all that passed on the subject. In cases of contradiction between Avitnesses, the Jury are at liberty to consider the probability of the narrative by them respectively given; to that end Salter’s account of the entire *445 transaction was proper to be looked at. Besides, the very testimony rejected, exhibited Graseman & Co., or Weber, (one of the firm,) while he had in his possession a charter party already signed, securing to the defendants ¿£12,000 charter money, endeavoring to pursuade Salter to accept a charter at a less rate, and it may, with some plausibility, at least, be argued that it was not probable Weber knew or expected that Graseman & Go. were to have not merely five per cent, but seven and one-half per cent on the gross charter money, and yet endeavored to reduce that gross amount and with it their own commissions. We think the entire negotiation between Graseman & Go., and Salter, was competent, and the defendants should have been permitted to give it in evidence.
The witness, Barclay, when examined in relation to the usual and customary compensation for effecting charters, stated that it was five per cent; but that he did not know what service the broker renders for the commission or compensation received, and did not know whether it included the services of reporting the vessel inwards. Having thus stated his ignorance, he was permitted against the defendants’ objection to state his opinion, that the five per cent did not include the consignee’s commissions for collecting the freight upon the inward bills of lading, the collection of such freight being the business of the charterer. This opinion corresponded with the testimony of some of the defendants’ witnesses, in part, but most of them had stated that the five per cent did cover the services for collecting the freight on the inward cargo, so far as that collection was made for the benefit of the owners of the vessel as a means of securing the unpaid charter money. It was, we think, not competent to allow a witness who said he did not know what service the broker rendered for the five per cent commission, to give such an opinion. It was an opinion by one who not only was not an expert, but by one who did not profess to have knowledge of the fact.
This ruling, as also most of those above referred to *446 which we deem erroneous, may not have been very important, but they were just grounds of exception, and it is a delicate matter for the Court to say that the defendants could not have been prejudiced thereby.
How the considerations which induced the charterers to give for the charter more than they first offered, were competent evidence for the plaintiffs, we do not perceive, when it does not appear that the defendants had any interview with the charterers, or had any knowledge of those inducements—possibly, if the defendants had been permitted to give the evidence of the whole negotiation between Salter and Graseman & Co., in which the efforts of the latter to induce him to accept less than £12,000, for the charter, appeared, the fact that Graseman & Co. had agreed to guarantee the charterers against loss, might' have been admissible by way of explanation of their apparent inconsistency above suggested, but as the case stood, it appears to us that Barclay’s testimony to what induced him to offer £12,000 for the charter, was irrelevant and improperly received.
An error, which is probably more important than any which have been mentioned, is found, we think, in the instruction to the Jury that “if they should find that the five per cent commission is compensation for collecting the amount of the unpaid charternnoney,” (i. e., the £6,500,) “and that for all collections over and above what would be sufficient to pay the unpaid charter money,” (i. e., for collecting the £3,100,) “full commissions of 2£ per cent are chargeable, then, in consequence of the breach by the defendants of the contract to consign, the plaintiffs have lost the opportunity of earning commissions for the collection of the freight of the return cargo, and are entitled to recover what they might have so earned.” To this the defendants excepted.
This instruction is so palpably inconsistent with itself, the conclusion being almost in terms a contradiction of the premises, that we greatly doubt that the case was, in this respect, correctly settled.
*447 The unpaid charter money, when the vessel returned, was £0,500. The freight of the return cargo was £9,600, and the excess of such freight over and above the unpaid charter money was, therefore, £3,100. If then, the five per cent was full compensation for collecting the unpaid charter money, and Graseman & Go. were only entitled to charge for collecting the excess, £3,100, then obviously they have been paid for their whole service, except two and one-half per cent on £3,100, and that is all that they lost by the neglect to consign the ship to them.
If the instruction had been in terms, or if it could be construed to mean, on the hypothesis suggested, “the plaintiffs have lost the opportunity of earning commissions for the collection of the freight of the return cargo, and are entitled to recover what they might have so earned, so far as it was not covered by the five per cent,” it would have been consistent and accurate in its result.
If the instruction be taken as it stands in terms in the case, it is wrong. It instructed the Jury in effect that the plaintiffs would be entitled to recover what they might have earned by collecting the freight of the return cargo, even though they had actually received a payment which compensated them fully for collecting £6,500 thereof.
Inconsistent as the instruction appears, still we cannot say that the Jury, (if in fact instructed in the language contained in the case as settled,) were not misled by it. The amount of the verdict, ($1,531.49,) corresponds very nearly with the amount of two and one-half per cent on £9,600, (the freight of the inward cargo,) and the interest thereon, and the statement of the plaintiff’s Counsel prefixed to his points submitted on the argument of this appeal, affirms that the verdict was for the amount of the commission at two and one-half per cent on that sum. The instruction referred to permitted the Jury to find that sum, although they should find that the five per cent already paid was compensation for collecting £6,500, part thereof. We cannot say that the Jury did not render their verdict in obedience to this precise instruction.
*448 For these reasons, we think, the judgment should be reversed, and a new trial ordered. Costs to abide the event.